RYAN D. LAPIDUS (Bar No. 196838)
Email: ryan@lapiduslaw.com
DANIEL C. LAPIDUS (Bar No. 227170)
Email: dan@lapiduslaw.com
JIM D. BAUCH (Bar No. 199454)
Email: jim@lapiduslaw.com
LAPIDUS & LAPIDUS
A PROFESSIONAL LAW CORPORATION
177 SOUTH BEVERLY DRIVE
BEVERLY HILLS, CALIFORNIA 90212
TEL: 310-550-8700
FAX: 310-943-2471

Attorneys for Plaintiff
4 and 1 Nutrition, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 4 AND 1 NUTRITION, LLC, a Delaware limited liability company,<br><br>        Plaintiff,<br><br>   vs.<br><br>SUN BROTHERS, LLC, a Nevada limited liability company,<br><br>        Defendants. | CASE NO.:  CV12-00357-GAF (MANx)<br><br>**DECLARATION OF MICHAEL SHURGOT IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Notice of Motion and Motion for Partial Summary Judgment, Separate Statement of Undisputed Material Facts, and Declarations of David Janow, Robert Bransky, and Jim D. Bauch filed concurrently herewith; [proposed] Order lodged concurrently herewith.]<br><br>[Fed. R. Civ. P. 56]<br><br>     <u>Hearing</u><br>Date: December 24, 2012<br>Time: 9:30 a.m.<br>Courtroom 740 [Roybal Building]<br>Judge: Hon. Gary Allen Feess<br><br>Action Filed: January 13, 2012<br>Discovery Cut-Off: February 1, 2013<br>Trial Date: April 30, 2013 |

## DECLARATION OF MICHAEL SHURGOT

I, Michael Shurgot, hereby state and declare as follows:

1. I am a Certified Public Accountant and also the Chief Financial Officer of Resolution Economics, LLC ("Resolution"). I submit this declaration in support of plaintiff 4 and 1 Nutrition, LLC's ("Plaintiff") Motion for Partial Summary Judgment. I have personal knowledge of the facts contained herein and if called as a witness I could and would testify competently thereto.

2. Resolution provides statistical and economic support to our clients in a variety of litigation settings, including data and statistical analysis, forensic accounting, and audits in commercial disputes. Resolution was retained by Plaintiff to conduct an audit of defendant Sun Brothers, LLC's ("Defendant") books and records, and to thereafter provide a report ("Report") of the audit. Based on the information Resolution reviewed, as thoroughly detailed and specifically stated in paragraphs 12, 23, and 27 of the Report, we concluded that, during the period from January 1, 2010 to December 31, 2011, Defendant made purchases of the ingredients necessary for the production of Plaintiff's rice protein formula from suppliers other than Plaintiff, including, but not limited to, Natural Ops. Attached hereto as **Exhibit 3** is a true and correct copy of the Report and its accompanying documents compiled by Resolution pursuant to the audit.

3. As the Chief Financial Officer of Resolution, I am the individual responsible for billing the services rendered and expenses incurred by Resolution for this audit. Resolution prepares itemized invoices for its client summarizing the time and expenses related to a particular audit. Such invoices are regularly prepared business records of Resolution. I have reviewed the invoices billed for this audit and am familiar with them.

4. Plaintiff was sent two invoices from Resolution for the services rendered and expenses incurred related to Defendant's audit. Such services and

expenses included sending Resolution's personnel to Defendant's office in Nevada to conduct and complete the audit, interviewing management and staff at Defendant's office, and reviewing Defendant's invoices, cash detail, sales reports, inventory, shipping documents, bank statements, and other records.

5.      The first invoice billed a total of $9,842.10 for time and expenses related to Defendant's audit during the period from January 1, 2012 to January 31, 2012. Resolution has been paid by Defendant for this first invoice. Attached hereto as **Exhibit 4** is a true and correct copy of the invoice for the period from January 1, 2012 to January 31, 2012.

6.      The second invoice billed a total of $39,210.81 for time and expenses related to Defendant's audit during the period from February 1, 2012 to March 30, 2012. A retainer in the amount of $5,000.00 initially received from Defendant was applied to the total of the second invoice, thereby reducing the outstanding balance on the invoice to $34,210.81. Attached hereto as **Exhibit 5** is a true and correct copy of the invoice for the period from February 1, 2012 to March 30, 2012.

7.      Resolution requires direct payment upon receipt of such invoices. The amount currently outstanding for services rendered related to Defendant's audit is $34,210.81. Since the execution of this Declaration, Resolution has not received any further payments for the amount currently outstanding.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 8, 2012 at *Beverly Hills* California.

MICHAEL SHURGOT

# EXHIBIT 3

4 and 1 Nutrition, LLC v. Sun Brothers, LLC

## Expert Report of Michael Shurgot, CPA

In the matter of

4 and 1 Nutrition, LLC v. Sun Brothers, LLC

### Assignment

1. This report was prepared in a response to a request by counsel for 4 and 1 Nutrition, LLC (4 and 1) to perform a forensic audit of Sun Brothers, LLC (Sun). I may revise my calculations based on any additional information that is made known to me in the future.

### Qualifications

2. I am a Certified Public Accountant and also the Chief Financial Officer of Resolution Economics LLC. In my previous work I have served as an auditor, and as a financial and accounting analyst for numerous companies. In the latter capacity, I worked for DLC Inc., a firm which specializes in deploying accounting and finance professionals into situations requiring due diligence, financial reviews, and forensic investigations. I also have worked in public accounting as a senior auditor for Arthur Andersen LLP. I have analyzed the financial condition of numerous companies across a wide range of industries. I have been qualified as an expert in Federal Court and have testified at both deposition and trial. My resume is attached to this report as Attachment 1. My billing rate is $400 per hour.

### Scope

3. The objective of this forensic audit is to determine the extent of the purchases made by Sun that breached the terms of the Sales and License Agreement (Attachment 2) dated December 17, 2009. At all relevant times, Sun has also done business as Sun Warrior, Raw Nature Boy and Sage Brothers and all references to Sun will include these entities.

### Background

4. Sun entered into a Sales and Licensing Agreement with 4 and 1 in December 2009. As part of this agreement, Sun agreed to purchase all ingredients necessary for the production of a rice protein formula from 4 and 1 exclusively for a period of 2 years and 6 months from the date of execution of the agreement.

Exhibit 3
- 4 -

4 and 1 Nutrition, LLC v. Sun Brothers, LLC

5.  The agreement further states that in the event Supplier (4 and 1) confirms in
    writing that it is not able to fulfill the requirements of the Company (Sun) order
    request, Supplier shall have the right to select a replacement vendor for the
    ingredients.

6.  An email memo (Attachment 3) was drafted by Cody Roberts (Roberts) and Russ
    Crosby (Crosby), both current Operating Managers for Sun. This memo was sent to
    David Janow, Bob Bransky and Edward Lim of 4 and 1 and was a followup to a
    meeting that took place on December 28, 2011.  In this memo, Sun admits that
    they purchased ingredients from Natural Ops without first getting 4 and 1's
    written consent, thus breaching terms in Paragraph 1 of the Sales and License
    Agreement.

7.  The memo claims that Jon Jensen (Jensen), a former acting employee and
    consultant was allegedly responsible for initiating purchases with another supplier
    due to a pending rice protein shortage. Rather than consult with 4 and 1 about this
    possible shortage and allow 4 and 1 to choose another supplier per the
    agreement, Jensen decided to go forward and purchase rice protein and other
    ingredients from another vendor called Natural Ops. It was later found that Jensen
    had an ownership interest in Natural Ops.

8.  Per the memo, Sun gave Jensen access to suppliers, vendors, international
    distributors, major retailers and sensitive company information without requiring
    a non-disclosure agreement or covenant not to compete. Jensen also was given
    authority over sales, marketing, operations and finance.

9.  Per the memo, Jensen was given a rubber stamp with Sun CEO Brent Hauver's
    (Hauver) signature. With this rubber stamp, Jon Jensen was able to sign checks as
    well as approve other transactions that Hauver should have been approving
    himself.

10. Per the memo and examination of Sun accounting records, it was discovered that
    $172,793 in payments going to another Jensen marketing company called
    Hyperthrive, were larger than agreed upon. Through interviews with Roberts and
    Crosby this amount should have been no more than $30,000 in total. It was this
    variance that caused Sun management to confront Jensen on his recent dealings.
    Jensen voluntarily left Sun soon thereafter.

Exhibit 3
- 5 -

4 and 1 Nutrition, LLC v. Sun Brothers, LLC

**Findings**

**Natural Ops Transactions**

11. A review of Sun's accounting records showed that they purchased $529,782 of ingredients from Natural Ops during 2011. This included 83 invoices and 1 American Express transaction. Invoices covering $480,535 or 90.7% of the total Natural Ops transactions were requested from Sun and reviewed for rice protein and other related formula ingredient purchases.

12. Further examination of these invoices showed that 33,475 KG of rice protein was purchased from Natural Ops (KG = kilograms):

| Invoice Date | Invoice No. | Description | Units Purchased (KG) | Price Per Unit | Cost |
|---|---|---|---|---|---|
| 04/20/11 | 2164 | Rice Protein | 3,475 | $ 6.5043 | $ 22,602 |
| 05/02/11 | 2172 | Raw Rice Protein "non-silk" | 12,000 | $ 6.7000 | $ 80,400 |
| 05/03/11 | 2175 | 80% Protein | 18,000 | $ 4.9700 | $ 89,460 |
| **Total Rice Protein** | | | **33,475** | | **$ 192,462** |

Per 4 and 1, the rice protein formula calls for 80% Oryzatein Silk to be used exclusively in the finished product. At the time of this engagement and per interview with Sun management, there was no way to verify whether any of the rice protein purchased from Natural Ops met this requirement.

13. These invoices also showed other ingredients that were purchased from Natural Ops. A Lost Profit Schedule (Attachment 4) was created that details these purchases. This schedule calculates that 4 and 1 lost $50,476 in profit due to Sun's purchases of ingredients, other than rice protein.

**Rice Protein Inventory Rollforward**

14. To ensure that no purchases, in addition to the Natural Ops purchases detailed above, took place with unauthorized vendors and/or outside of the accounting system, a rollforward of the rice protein inventory was performed.

15. An inventory rollforward is a mathematical calculation of the ending inventory as of a certain date. It can be expressed in terms of dollars or in units. For the

Confidential Attorney Work Product

Exhibit 3
- 6 -

4 and 1 Nutrition, LLC v. Sun Brothers, LLC

purposes of this analysis, the inventory rollforward will be expressed in kilograms (KG) or units and the ending date will be 12/31/2011.

The rollforward is based on the following inventory accounting formula:

> Beginning Inventory
> Plus: Purchases
> Less: Cost of Goods Sold
> Less: Spoilage/Waste
> Equals: Ending Inventory

By recalculating the ending inventory for 12/31/2011 with the rollforward, a comparison can be made to the ending inventory that has been verified by Sun. If the amount of inventory verified by Sun exceeds the amount calculated in the inventory rollforward, I will conclude that Sun purchased this excess inventory from another source.

16. An examination of the QuickBooks accounting file for 1/1/2010 through 12/31/2011 showed that Sun had 132,011 KG of rice protein at 12/31/2011. Sun management verified that they were comfortable with this final count and that the ending inventory required no adjustment.

17. Further review of the inventory detail showed that many of the transactions were performed by inventory adjustment rather than by inputting the actual units and price per unit from the purchase orders and/or vendor invoices.[1]

Inventory adjustments are manual adjustments that are made to the inventory in order to balance the amount in the accounting system with a physical inventory count. These adjustments cannot always be tied back to a specific inventory transaction. Because of this limitation, there is no way of knowing whether an inventory adjustment that results in a reduction of inventory is due to a sale, a loss of product due to damage, theft from the warehouse or inventory that was never delivered. Inventory adjustments should only be used for inventory count reconciliations; not as a primary way of recording inventory in the accounting system.

The movement of inventory could not be tested by the examination of the QuickBooks file alone due to the lack of detail in the accounting system and weak accounting controls over the proper input and reconciliation of inventory.

[1] This was also verified by Sun CFO, Wes Williams

Exhibit 3
- 7 -

18. For instance, the 1/1/2010 through 12/31/2011 QuickBooks file showed purchase inventory detail from 4 and 1 at $129,935. Examination of sales invoices from 4 and 1 to Sun amounted to $2,166,671, showing a variance from the purchase inventory detail of $2,036,736. When compared to the dollar amount paid to 4 and 1 by Sun during this period, the $2,166,671 in purchases is reasonable.

Based on this example, I was comfortable that Sun purchased $2,166,671 of ingredients from 4 and 1. However, I was unable to verify which products or ingredients were purchased, what unit quantity was purchased or what the price per unit was for $2,036,736 or 94.0% of those purchases.

19. The inventory rollforward was calculated manually due to the limited inventory detail in the QuickBooks file. This entailed rebuilding purchases detail from sales invoices provided by 4 and 1. The purchases summary schedule (Attachment 5) shows that 285,075 KG of rice protein was purchased from 4 and 1 between 1/1/2010 and 12/31/2011. When added to the verified 33,475 KG purchased from Natural Ops[2], the total rice protein purchased between 1/1/2010 and 12/31/2011 was 318,550 KG.

20. Cost of Goods Sold (COGS) was also recalculated. COGS are the outflow of inventory due to a sale of a finished good. According to the formula, it may take .90 KG of rice protein to make one finished good ready for sale. Thus, if 10,000 finished goods are sold, then 9,000 KG[3] of rice protein was used to produce these finished goods. Based on the formulas that were provided by 4 and 1 and Sun and Sun Sales History Report for 2010-2011 (Attachment 6), 225,595 KG of rice protein was used to produce finished goods between 1/1/2010 and 12/31/2011.

21. Spoilage or waste is the destruction or loss of inventory. Spoilage can occur during the manufacturing/packing process or due to an accident where the rice protein has been damaged or lost. Sun provided waste factors for 2010 at 10% and 2011 at 15%. The blended rate based on the sales allocation between 2010 and 2011 is 13.5%. When this factor is applied to the COGS of 225,595 KG[4], the waste factor is 30,455 KG.

[2] Detailed in Paragraph 12

[3] 10,000 finished goods times .90 KG equals 9,000 KG

[4] Detailed in Paragraph 20

4 and 1 Nutrition, LLC v. Sun Brothers, LLC

22. Similar procedures were followed for the 1/1/2008 through 12/31/2009 Sales History (Attachment 7) provided by Sun in order to determine the beginning inventory for January 1, 2010. Based on that analysis, the beginning inventory for January 1, 2010 is 13,267 KG.

23. Using the formula described in Paragraph 15 and information from Paragraph 16 and 19-22, the following is the calculation of the inventory rollforward:

| | |
|---|---:|
| **Beginning Rice Protein Inventory 01/01/2010 (KG)** | **13,267** |
| Plus: Purchases | 318,550 |
| Less: Cost Of Good Sold | (225,595) |
| Less Spoilage/Waste | (30,455) |
| **Ending Rice Protein Inventory 12/31/2011 (KG)** | **75,767** |
| **Ending Rice Protein Inventory 12/31/2011 Per Sun (KG)** | **132,011** |
| **Excess Rice Protein Inventory (KG)** | **56,244** |

The inventory rollforward shows that Sun purchased 56,244 KG of rice protein from another source.[5]

**Shipping Document Review**

24. To examine whether purchases took place with unauthorized vendors and/or outside of the accounting system, shipping documents were requested from Sun.

25. From these documents, the quantities of all ingredients delivered to the co-packers Sun hired to mix and pack the finished goods could be verified. After my request, Sun informed me that this information would be hard to obtain. I have requested that Sun produce all available shipping documents that could be used to validate the quantity of ingredients purchased and received between 1/1/2010 and 12/31/2011.

26. After reviewing all of the shipping documents provided by Sun, rice protein was used as a test example due to it being the single largest ingredient by quantity and dollar amount. The shipping documents received were related to 4 and 1 and supported 102,850 KG or 32.3% of the 318,550 KG[6] of rice protein that was

---

[5] Based on the actual purchases, sales and waste factor for Sun between 1/1/2010 and 12/31/2011

[6] Detailed in Paragraph 19

Exhibit 3
- 9 -

purchased by Sun between 1/1/2010 and 12/31/2011. There were no shipping documents to support the Natural Ops purchases[7] and thus no proof that the quantity that was purchased was actually received. I was unable to complete further testing due to the limited number of shipping documents made available by Sun.

## Conclusions

27. Based on the information I have reviewed to date and the summation of the calculations in Paragraphs 12 and 23, there were 89,719 KG of unauthorized purchases of rice protein.  Based on the calculations in Attachment 4, I estimate the lost profit for the breach of written contract to be $50,476 for ingredients purchased, other than rice protein. I may revise my calculations based on any additional information that is made known to me in the future.

## Materials Received

- Complaint for Breach of Contract dated January 13, 2012
- Sales and License Agreement between 4 and 1 and Sun dated December 17, 2009
- Sales invoices and lead schedule from 4 and 1 containing ingredients sold to Sun
- Sales invoices from Natural Ops containing ingredients sold to Sun
- Memo from Sun management (Crosby and Roberts) detailing the events that led up to the breach of the Sales and License Agreement as well as the aftermath
- Formula ingredients and units of measure from 4 and 1 for the 1 KG Bag of Sunwarrior Raw Vegan Rice Protein (Vanilla, Chocolate and Natural)
- Sun's QuickBooks (QB) accounting files for the 2008-2009 and 2010-2011 calendar years
- Shipping documents provided by Sun to support ingredients received
- Sun vendor Invoices for purchases made in 2010-2011
- Sun sales history reports by product for 2008-2011

## Recommendations

- Additional information should be requested from Jensen regarding all business dealings and entities that were created during Jensen's tenure at Sun. This should include information about partners, agreements, transaction

[7] Detailed in Paragraph 12

4 and 1 Nutrition, LLC v. Sun Brothers, LLC

data and any other related information between these entities, Jensen and Sun.

- Sun should improve its record keeping process with respect to shipping documents. All shipments received by the co-packer should have a shipping document or bill of lading attached without exception. These documents should be used to verify the products and quantities received are what were ordered. Copies of these shipping documents should be sent to the accounting department at Sun for reconciliation with purchase orders and invoices.

- Sun should improve its internal control over the management of inventory detail in the accounting system. This would include recording all inventory purchases from either purchase orders or invoices by product, quantity and cost per unit. A bill of materials should be used in the accounting system to build finished goods and thus reduce the materials inventory. All customer sales should show a reduction of inventory for the related product

- A weekly or monthly cash report should be developed that shows the inflow and outflow of cash. This report should be reviewed by the CFO, Operating Managers and an Owner.  Outflow should be reviewed for unusual vendors and/or dollar amounts and explained when necessary. If this had been done previously, it would have been obvious that the Hyperthrive entity was being paid more than what was agreed upon.

- Sun should improve separation of duties and oversight; the activities of authorization, recording and custody should be separated and given to multiple individuals to improve internal control and reduce the risk of fraud in the future.

I declare under penalty of perjury that the forgoing is true and correct.  Executed on this 25th day of March 2012, at Beverly Hills, California.

Michael Shurgot, CPA

Confidential Attorney Work Product

Exhibit 3
- 11 -

4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 1


**resolution economics** llc

9777 Wilshire Blvd
Suite 600
Beverly Hills, CA 90212
Office.310.275.9137
Fax.310.275.9086

# MICHAEL J. SHURGOT, CPA

Mr. Shurgot is the Chief Financial Officer of Resolution Economics LLC. He has a BA in Economics with an Emphasis in Business from the University of California, Los Angeles (UCLA). Mr. Shurgot is a Certified Public Accountant licensed to practice in the State of California. Prior to Resolution Economics, Mr. Shurgot was a consultant with The David Lewis Company. Before that he has held senior management level roles as the CFO, Controller and Director of Finance for several closely held business enterprises. Prior to this, Mr. Shurgot was a Senior Accountant at Arthur Andersen LLP.

## Professional Experience

Mr. Shurgot's experience is extensive in the areas of auditing, forensic accounting, financial reporting, operational consulting, due diligence, strategy, mergers and acquisitions and financial planning and analysis. He is experienced at testing specific financial transactions for reasonableness, contract compliance or determining when material errors or irregularities exist. He also is experienced at working with large data sets and identifying operational or financial process improvement opportunities and implementing corrective solutions.

## Commercial Litigation

- Consulting and expert witness services in a case alleging lost profits from the termination of a crane dealership. Services included constructing a but-for lost profits model and rebutting the opposing expert's analysis.

## Mergers & Acquisitions Consulting

- Business valuation of a spin off real estate entity that was created as a by-product of a major banking merger. Services included developing a discounted cash flow model for valuation comparisons and entity structure review and analysis to maximize after tax cash flow.

- Due diligence representing the buyer of a graphics design company. Services included business valuation, financial forecasting, inventory valuation, billing of materials development, sales commission analysis and gross profit testing.

- Due diligence for debt capital infusion for an economic consulting firm. Services included testing management assertions regarding business expansion, financial and cash forecasting, conversion from cash to GAAP accounting and management of the accounting and finance function until successful deal close.

- Business merger of two prominent real estate services firms. Services included accounting and management reporting systems integration and testing and revision of financial policies and procedures.

Confidential Attorney Work Product

**Exhibit 3**
- 12 -

4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 1



- Business integration of a diversified film and media company. Services included a review of all existing operational processes in the marketing finance department of the combined entity, elimination of redundant systems and improvement of the financial reporting package.

## Forensic Accounting

- Forensic audit of publicly traded health care provider to quantify the actual occurrences of Medicare billing fraud. Services included multi-site detailed review of patient medical records, doctors' orders and the related Medicare billing and interviews with medical staff to determine a statistical sample for measurement of potential liability.

- Forensic audit for a multi-national commercial real estate services firm for a business acquisition. Services included determining the extent of overcharged compensation to the benefit of brokers of the acquired firm, review of existing sales and lease transactions and recalculation of bonus and commissions from source documents as well as ensuring proper cutoff.

## Process Improvement

- Operational audit of billing of materials process for a multi-national media company regarding DVD manufacturing and production. Services included suggestions for process improvements to eliminate recurring errors in production specs, suggestions for implementation of a project management system and corrective action to improve internal control processes.

- Operational review of a product line for a computer equipment manufacturer. Services included recommendations on marketing strategies, pricing, product life cycle analysis, optimal SKU mix and ROI tools.

- Gross profit tool for a major entertainment media retailer. Services included development of profit and volume software model to help identify and eliminate slow moving stock in the existing >1M SKU inventory so that product line profitability could be increased.

## Testimony and Affidavits Presented

In the matter of **Colton Crane Company LLC v. Terex Cranes Wilmington, Inc. _et al._** Case No. CV 08-8525 PSG (PJWx) (United States District Court, Central District of California) related to the calculation of lost profits from an alleged crane dealership termination. Report filed April 29, 2010. Deposition testimony May 20, 2010. Trial testimony June 1, 2010.

Confidential Attorney Work Product

**Exhibit 3**
**- 13 -**

4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 1



## Summary of Employment Experience

**Resolution Economics LLC**
Chief Financial Officer
May 2008 to date.

**The David Lewis Company**
Consultant, M&A, Due Diligence and Financial Planning & Analysis Services
2004 to 2008

**Charles Abbott Associates**
Director of Finance, Civil Engineering and Design Services
2000 to 2004

**The Obie Company**
Chief Financial Officer, Media Event Production and Rental Services
1999 to 2000

**Pacific Financial Research**
Accounting Manager, Institutional Investment Management Services
1996 to 1999

**Arthur Andersen LLP**
Senior Accountant
1991 to 1995

## Education

BA, Economics/Business, The University of California, Los Angeles (UCLA)
Certified Public Accountant, California #69366

## Professional Affiliations

American Institute of Certified Public Accountants
California Society of CPA's, Los Angeles Chapter

Confidential Attorney Work Product

**Exhibit 3**
**- 14 -**

### SALES and LICENSE AGREEMENT

THIS SALES and LICENSE AGREEMENT ( "Agreement"), dated as of _____ day of December, 2009, is made and entered into by and between 4 and 1 Nutrition, LLC, a Delaware limited liability company with a principal place of business at 12100 Wilshire Boulevard, Los Angeles, California 90025 (hereinafter "Supplier"), and Sun Brothers, LLC, an Nevada limited liability company with its principal place of business at 257 South Moapa Blvd., Overton, NV 89040 (hereinafter the "Company"). Each of Supplier and Company may sometimes be referred to herein as a "Party" and collectively as the "Parties."

### WITNESSETH

WHEREAS, Supplier sells brown rice protein, related brown rice products, and other related commodities associated with products comprised of rice protein as its base component;

WHEREAS, Company is in the business of manufacturing and marketing various health related products for wholesale and retail sale; and

WHEREAS, Company desires to purchase and Supplier desires to sell to Company certain ingredients.

NOW THEREFORE, in consideration of the promises and the mutual agreements contained herein, Supplier and Company, agree as follows:

**1. Agreement as to Ingredient Purchase.** For a period of two (2) years and six (6) months from the date of execution of this Agreement, Company shall exclusively purchase from Supplier all ingredients necessary for the production of the rice protein formula (hereinafter the "Ingredients"). Except for Oryzatein, as set forth below, Company shall make payment for the Ingredients ordered from Supplier in an amount equal to a thirty (30%) percent mark-up on Supplier's cost. Company acknowledges that Supplier may obtain certain products and Ingredients from third-parties and that a delay in delivery may occur beyond the reasonable control of Supplier. To ameliorate such delays, Company agrees each month to provide Supplier with reasonably developed forecasts of its Ingredients needs for the upcoming three (3) calendar months. In the event Supplier confirms in writing that it is not able to fulfill the requirements of a Company order request, Supplier shall have the right to select a replacement vendor for the Ingredients and will use best efforts to obtain such Ingredients at the same quality and price as currently purchasing.

For the first six (6) months of the Term, the Company shall have the right to purchase Oryzatein™ at rates set forth as follows:(i) o – 1 metric ton at $6.55 per kilo; (ii) 1 – 5 metric tons at $6.35 per kilo; (iii) 5-10 metric tons at $6.15 per kilo; and (iv) more than 10 metric tons at $5.95 per kilo. Following each six (6) calendar month period during the Term thereafter, the price per kilo for Oryzatein may be adjusted by Supplier, in its sole and absolute discretion, either upwards, not more than ten (10%) percent from the previous price or downwards not more than three (3%) percent than the previous price, based upon Suppliers costs and the market price, and to be reasonable and competitive with pricing extended by Supplier to other purchasers. The Company agrees that it will not sell Oryzatein in bulk to any third party company or distributor.

1

Confidential Attorney Work Product

**Exhibit 3**
**- 15 -**

Within three (3) business days following Company's order of an Ingredient, Supplier shall provide confirmation to Company that the order has been received and shall provide Company with tracking numbers and related identifying information. Supplier shall provide to Company written evidence of all such orders placed, received, and shipped within a reasonable time following placement of any such order. The delivery requirements for Ingredients purchased and other related terms shall be reasonably negotiated by Supplier and Company at the time of the order. If there is a conflict between this Agreement and a purchase order for Ingredients, the terms of the purchase order shall govern as it may relate solely to the delivery of the Ingredients. Notwithstanding anything herein to the contrary, Supplier shall not be considered in default in the performance of any obligation hereunder to the extent that the performance is prevented or delayed by fire, flood, explosion, strike, war, insurrection, embargo, government requirement, civil or military authority, act of God, or any other event, occurrence or condition which is not caused, in whole or in part, by Supplier, and which is beyond the reasonable control of Supplier.

**2. Intentionally Left Blank**

**3. License.** Supplier hereby licenses to the Company, on a limited, non-exclusive, worldwide, revocable basis, for a period of ten (10) years (the "License") the following:

   A) the Formulas, as they may be developed by 4and1 and set forth on Schedule A, as the same may be amended from time to time. For purposes of creating new Formulas and the development of new Products, the Parties agree that if such new Formulas utilize a rice protein/rice protein powder base, 4and1 shall be the sole owner of such new Formula(s); and

   B) various marks owned and, as they may be developed by 4and1 and as set forth on Schedule B, as the same may be amended from time to time.

The Company hereby expressly acknowledges and agrees that any and all of the Formula(s), marks and other intellectual property which is the subject of this Section 3, and any derivatives therefrom are the exclusive property of Supplier or its parents, subsidiaries and affiliates, as the case may be, and that the Company does not have any rights, claims or interests in, or with respect to them. For purposes of clarification, a derivative of the Formula is any formula, that (a) is based on the licensed Formula and (b) rice protein makes up fifty (50%) percent or more of the key element.

Supplier acknowledges that it has no right, title and interest in and to any of Company's registered trademarks, with specific reference to the Sun Warrior trademark.

The Parties agree that the License set forth herein shall be revocable under the following conditions: (i) if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as now exists, or as may be amended, is filed by either Party; (ii) if such a petition is filed by any third-party against a Party and such petition or application is not resolved favorably by such Party within sixty (60) days; (iii) the breach or threatened breach of this Agreement by Company, as determined by Supplier in its sole discretion.

2

Confidential Attorney Work Product

**Exhibit 3**
**- 16 -**

4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 2

**4. Payment.** The Company shall pay for the Ingredients within ten (10) days of purchase by 4and1. In the case of the Oryzatein, Sun shall pay within five (5) days once the Oryzatein has cleared the regulatory process in the US; notwithstanding anything herein to the contrary, any melamine tests being conducted by 4and1 will not interfere with timely payment once the product is cleared by customs. All payments shall be made by wire transfer to the following account:

## WIRE TRANSFER INSTRUCTIONS

**5. Representations and Warranties.**

5.1 **Company.** Company hereby represents, warrants and covenants that: (i) it is duly formed, validly existing and in good standing under the laws of the state of its formation; (ii) it has the requisite corporate power and authority to execute, deliver and the ability to perform this Agreement and its terms hereunder; and (iii) no conflict of interest has arisen, or will arise, as a result of Company's execution of this Agreement, any third-party or other agreement to which the Company may have entered.

5.2 **Supplier.** Supplier represents warrants and covenants that: (i) it is duly formed, validly existing and in good standing under the laws of the state of its formation; (ii) it has the requisite corporate power and authority to execute, deliver and perform this Agreement and its terms hereunder and (iii) no conflict of interest has arisen, or will arise, as a result of Supplier's execution of this Agreement under any third-party agreement.

**6. Term.** This Agreement shall be effective as of the last date written on the signature page and have a term of two (2) years and six (6) months (the "Initial Term"). The Agreement may be renewed for successive one (1) year periods (each, a "Renewal Term" and together with the Initial Term, the "Term") upon the mutual consent of the Parties.

Either Party may terminate this Agreement immediately in the event of the occurrence of one or more of the following: (i) if a petition under any foreign, state, or United States bankruptcy act, receivership statute, or the like, as now exists, or as may be amended, is filed by either Party; (ii) if such a petition is filed by any third-party against a Party and such petition or application is not resolved favorably by such Party within sixty (60) days or (iii) either Party materially breaches this Agreement. Termination of this Agreement shall be without prejudice to any other legal and equitable rights and remedies of the Parties.

The Parties acknowledge and agree that upon termination or expiration of this Agreement, Supplier shall solely and exclusively own the Formulas.

3

Confidential Attorney Work Product

Exhibit 3
- 17 -

7. **Relationship of the Parties.** This Agreement is an arm's length transaction of independent contractors. Nothing in this Agreement is intended nor shall it be construed as creating a joint venture, agency, partnership or employer/employee relationship, or any legal or equitable relationship other than that of independent contractor.

8. **Confidentiality.** The terms and obligations set forth in this Section 8 shall survive any termination or expiration of this Agreement. In performing its obligations hereunder, Company shall have access to and receive certain confidential and/or proprietary information about Supplier, its affiliates and clients including, without limitation, details related to the Ingredients and Formulas, and such other information and materials that Supplier considers confidential, trade secret and/or proprietary ("Confidential Information"). Neither Company, any third party manufacturer nor subcontractor hired by it, nor any of their employees or agents, successors or assigns, shall directly or indirectly use any of the Confidential Information for any purpose except in furtherance of their rights and obligations hereunder. Company agrees to not give, sell or in any way transfer, either directly or indirectly, Confidential Information to any third-party without the prior written approval of Supplier, except as may be required by law. Except as provided for in this Agreement, Company is prohibited from using Confidential Information, directly or indirectly, for its own benefit or gain. Company shall take all steps necessary to maintain the confidentiality of the Confidential Information in its possession, but in any event, no steps less than those Company uses to protect its own Confidential Information. Company hereby acknowledges the sensitive nature of the Confidential Information and agrees that to immediately notify Supplier of any such breach, whether actual or suspected. Company further agrees that is shall use is best efforts to recover any such lost or breached Confidential Information.

For purposes of this Agreement, the following shall not constitute Confidential Information: (i) information that is or becomes publicly known without violation of similar confidentiality obligations by the disclosing Party; (ii) information that is already known to Company without confidentiality obligations or restrictions at the time of its disclosure; (iii) information that, after its disclosure is made known to Company without restrictions by a third party having the right to do so.

If Company receives a subpoena or other administrative or judicial notice requesting the disclosure of Confidential Information, Company shall promptly notify Supplier and, if so requested, shall cooperate with 4and1 in resisting the disclosure. Subject to its obligations stated in the preceding sentence, Company shall be entitled to comply with any binding subpoena or other process to the extent required by law, but shall in doing so make every effort to secure the confidential treatment of any materials Sun is compelled to disclose.

9. **Miscellaneous.**

9.1. Applicable Law and Headings. This Agreement shall be construed in accordance with and shall be governed by the laws of the State of California applicable to agreements made and to be performed in California and shall be construed without regard to either conflicts of law or any presumption or any other rule requiring construction against the Party causing this Agreement to be drafted. The Parties consent to the jurisdiction of the federal courts of the State of California, County of Los Angeles for all matters pertaining to this Agreement. Should any matter requiring the intervention of the courts arise hereunder, but not qualify for federal court jurisdiction, the Parties agree and consent to the jurisdiction of the state courts of the State of California, County of Los Angeles. Headings are for reference and are not intended to affect the meaning of any term or condition of this Agreement.

4

Confidential Attorney Work Product

Exhibit 3
- 18 -

Case 2:12-cv-00357-GAF-MAN Document 34-6 Filed 11/19/12 Page 20 of 38 Page ID #:507
4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 2

9.2 Notices. All Notices and other communications required or permitted to be given under this Agreement shall be in writing and will be deemed to have been duly given on the date delivered by hand, by overnight courier service or by messenger, or upon delivery by registered or certified mail (return receipt requested) postage prepaid, to any Party at the following addresses:

For Supplier: 12100 Wilshire Boulevard, Los Angeles, California 90025
Attention David Janow.
With a copy to WRK Legal Services, at 315 East 65th Street #5A, New York, NY 10065,
Attention Wayne R. Kaufman, Esq.

For Company: 257 South Moapa Blvd, Overton, NV 89040,
Attention Brent Hauver.
With a copy to Company at
4900 North Ocean BLVD, UNIT # 216 Fort Lauderdale, FL 33308.
Attention Nick Stern.

9.3 Entire Agreement. This Agreement contains the entire agreement between the Parties with respect to the subject matter set forth herein and supersedes, substitutes, replaces, and, except as otherwise set forth herein, overcomes any previous agreements between the Parties with respect solely to the subject matter hereof. This Agreement is not intended to, and does not, modify, excuse, condition, or otherwise alter the Settlement Agreement or the rights and obligations contained therein. Nothing in this Agreement is intended to nor shall prohibit Supplier from enforcing its rights under the Settlement Agreement, including but not limited to the entry of judgment and injunctive relief.

9.4 Amendments and Waivers. No modification to this Agreement nor any failure or delay in enforcing any term, shall be construed as a waiver of such term unless explicitly so stated in writing. No provision of this Agreement may be amended or waived, unless such amendment or waiver is memorialized in writing and is signed by each Party hereto.

9.5 Assignment. Neither Party may assign this Agreement, including its rights and obligations hereunder, to any third party without the prior written consent of the other Party.

9.6 Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

9.7 Non-Compete / Non-Solicit. The Company hereby covenants and agrees that during the Term hereof, which is twelve (12) months, it will not, without the prior written consent of Supplier, directly or indirectly induce or attempt to induce any of the employees of Supplier to leave the employ of Supplier, or solicit the business of any client or customer of Supplier or any consultant to Supplier. In addition, during the Term hereof, Company shall not, engage in, or own or control an interest in, or act as principal, director or officer of, or consultant to, any firm or corporation (i) engaged in a venture or business substantially similar to that of the Supplier or (ii) which is in direct or indirect competition with the Supplier.

5

Confidential Attorney Work Product

Exhibit 3
- 19 -

9.8  Severability and Survival.  If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable, such term or provision will be modified to the extent necessary in the court's opinion to render such term or provision enforceable. Further, such term or provision will not affect the other terms or provisions thereof or the whole of the Agreement.  Company agrees that the License, Confidentiality and Title Sections of the Agreement shall survive the termination or expiration of this Agreement.

9.9  Waiver of Consequential Damages.  In no event shall either Party hereto be liable to the other for consequential damages of any kind including, but not limited to loss of profits, loss by reason of shutdown, loss of product, or loss of use, arising from or in connection with this Agreement.

9.10  Title and Return of Work Product.  All right, title and interest in and to works of authorship including, but not limited to, Formulas, drafts, workpapers, designs, plans, specifications, programs, computer output, valuations, estimates, reports, data, memoranda, findings, recommendations of every description and every innovation, conception, improvement, discovery or invention and any intellectual property rights associated therewith (collectively, the "Work Product") which are created, utilized or developed in connection with the Formulas, shall vest in and become the sole and exclusive property of Supplier. Company hereby irrevocably assigns all right, title, and interest in the Work Product to Supplier and shall, for no additional consideration, take any and all requisite steps and execute any and all such documents necessary to transfer the rights in the Work Product to Supplier.

Supplier hereby agrees that it shall not have any right in or to any customer database ("Database") created by Company, solely by Company's efforts and that Supplier shall return any Work Product related to the Database in accordance with this Section 9.10. In addition, Supplier further agrees that a final product manufactured by the Company, whether or not such final product utilizes the Formula, shall not be considered Work Product in connection with this Agreement.

Not later than ten (10) business days following the termination of this Agreement, each Party shall return all Work Product, Confidential Information and other documents due to be returned hereunder to the other Party and shall certify by signature of an officer of the returning Party the return or destruction, at the sole discretion of the receiving Party, of all such documents. The confidentiality obligations of this Agreement shall remain in full force and effect for as long as 4and1 maintains any of the Formulas as a trade secret or other proprietary intellectual property.

*[Signature Page Follows]*

6

Confidential Attorney Work Product

Exhibit 3
- 20 -

4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 2

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their officers duly authorized as of the date first written above.

4 AND 1 NUTRITION, LLC

_____     Date: _____
By:
Its:

_____     Date: _____
By:
Its:

SUN BROTHERS, LLC

_____     Date: _Dec 17 2009_
By: A Gr
Its:

_____     Date: _Dec 17 2009_
By:
Its:

7

Confidential Attorney Work Product

**Exhibit 3**
**- 21 -**

4 and 1 Nutrition, LLC v. Sun Brothers, LLC

Attachment 3



Transforming the Planet One Warrior at a Time

Dear Sirs,

This is a follow up to our meeting on December 28, 2011. In the meeting between Ed, Bob, Cody and me, it was determined that the next logical step was a letter detailing the circumstances surrounding the current situation.

To explain requires that sufficient background be presented first. It begins with Jon Jensen whom each of you knows, at least to some degree. Jon was hired by Sunwarrior to take us to the 'next level'. At that time, Sunwarrior was still relatively small and only employed about 2 other people. Jon was immediately thrust into a position of authority as 'second in command' behind Brent Hauver, a company owner and CEO. Acting in this capacity permitted Jon access to our suppliers, vendors, international distributors, major retailers, as well as sensitive company information. He never signed an NDA or Non-Compete.

Jon proved himself quickly and unofficially retained the position of Operating Manager or 'de facto CEO'. This gave him authority over Sales, Marketing, Operations and Finance. During this time, Jon co-created an entity to assist Sunwarrior in their marketing efforts. This company was called HyperThrive and it was later found that the contracted monthly fee to Sunwarrior was heavily inflated month after month. The checks to HyperThrive being signed with a 'Brent Hauver' rubber stamp. Total amount that went to HyperThrive was well over $100,000 beyond what was contracted. This info is pertinent as it sheds some light on the character of Jon Jensen.

During this time, Jon was alerted to a pending rice shortage in China possibly due to scheduled weekly black outs. We've been told that Jon actually spoke with Bob about this and Bob mentioned that they were tapped out. Jon immediately went to work on verifying this info and subsequently found a second supplier of rice protein. Soon after, an order of 3,475 kilos was placed to appease this supplier. (See page 1 of attached) It wasn't long after this that a container order from Axiom / 4 & 1 was put on FDA hold causing considerable stress. His obvious concerns were that this could put Sunwarrior out of business and him out of a job; he even told Brent that he was updating his resume in the event this would end Sunwarrior. With the table set and a container on FDA hold, 2 more PO's were issued to Natural Ops totaling 12,000 kilos and 18,000 kilos respectively. (Pages 2-3 of attached) It is very important to note that Jon Jensen had an ownership interest in the very company Sunwarrior was purchasing from, Natural Ops. It is quite evident that Jon had more to 'gain' than simply saving Sunwarrior and his job. Also of note is Brent Hauver's role as CEO of Sunwarrior at the time this happened. Along with the authority of this position comes the responsibility as well. Yes, Brent should have known what Jon was doing and will ultimately be held accountable by his partners. However, Jon was the architect of these machinations and works best 'in the dark'.

Hindsight reflects very poor judgment on his/Sunwarrior's behalf. The appropriate reaction should have been an open dialogue with Axiom / 4 & 1 expressing our fears, concerns and possible solutions. We sincerely wish this to have NEVER happened but it did. Coming clean with the 'why', 'when', and 'how much' is extremely important if we are to move forward with your company.

Once Jon realized that his sins had been uncovered, he voluntarily left the company and moved over to an upstart / potential competitor. This new company was called David Wolfe Foods. It was here that Jon and his partners created a DHA product to bring to market. Investors were brought in and money was spent only for the short lived company to implode due to infighting. The blame was put on Brent Hauver as he allegedly made disparaging calls to key players warning them of Jon Jensen. With thousands of dollars spent on a finished DHA product and no ability to move it, Jon Jensen's recourse was to find a buyer who would want to private label. A blackmail letter was sent to the owners of

Confidential Attorney Work Product

**Exhibit 3**
**- 22 -**

4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 3

Sunwarrior demanding that we purchase their stock or legal action would ensue. We didn't adhere to their demands which meant war for Jon and his team with the only objective to take Brent Hauver and Sunwarrior down. This brings us to 'today'.

The purpose Cody and I drove to California to visit with you was twofold:

1. To disclose the misdoings of Jon Jensen relative to Sunwarrior's contract with you. We want to be totally transparent in all of our dealings.
2. To enlist your help in defending the recent slew of attacks against Rice Protein / Sunwarrior authored by Jon Jensen and his team.

As mentioned in our meeting, Jon and team have been furiously trashing rice protein from China on numerous message boards, blogs and in letters to larger chain stores like The Vitamin Shoppe. Smears about protein from China containing melamine and heavy metals that cause cancer and birth defects just to name a few. These accusations, if continued, would impair our ability to grow rice protein sales and potentially impact ALL rice protein sales if not contained. (Pages 4-6 of attached) We are now in the process of countering this smear campaign by defending the rice protein directly with our buyers as well as working with our legal team to mute Jon. We have sent out a 'cease and desist' letter to Jon's team and only time will tell if they comply. (Pages 7-8 and pages 9-10 of attached) As of now, they have cut off all lines of communication which leaves us with only one unfortunate avenue, to bring a suit against them. We certainly appreciate the documentation that you've presented thus far which aids in our defense. We hope to be able to reach out to you when circumstances demand as we see you as our closest ally in this campaign.

A SOLUTION –

It goes without saying that we are interested in avoiding any legal battles with Axiom / 4 & 1 as this would severely handicap our growth. We are projecting total revenues for 2012 at 9.75 million, a significant increase to the 5.3 million done in 2011. To reach this goal requires a harmonious relationship with you. Our company structure changed in July 2011 as Cody and I became the acting Operating Managers for Sunwarrior. (Final page of attached) We immediately set to work on 'righting' the 'wrongs' of the previous administration. Both Cody and I are relationship driven and we know that better business is done with transparency and trust. We are loyal and can appreciate paying a premium to maintain strong working relationships and believe that this type of interaction eventually affords us 'best' pricing. We are patient, practical and not unreasonable and hope to exhibit these traits over time. As we've never met David, we feel it important to do so. Cody and I have been empowered to be make decisions on behalf of the company so we have the authority that our titles intimate. Brent Hauver is no longer the CEO. He sits on the board with the other 2 owners. They communicate the vision and we simply carry it out.

We offer the following as a resolution:

1. An annual financial audit
2. Total compliance while working through this issue and into the future

Thank you for allowing us to provide our 'side of the story' and know that we are happy to provide more detail if needed. While we are anxious to know your thoughts on the above issues, we will be patient in awaiting your reply. We WANT to do business with you.

Sincere Regards,

Russ Crosby and Cody Roberts

Confidential Attorney Work Product

Exhibit 3
- 23 -

**Sun Brothers, LLC**
**Natural Ops Sales Invoice Testing**
**Lost Profit Schedule**

| Ingredients | Units Purchased From Natural Ops | 4 and 1 Avg Marked Up Cost Per Unit | Markup Factor | 4 and 1 Avg Cost Per Unit Markup | Markup | Lost Profit |
|---|---|---|---|---|---|---|
| APPLE PECTIN | 300 | $14.89 | 1.3 | $11.45 | $3.44 | $1,031 |
| CHOCOLATE FLAVOR | 1,650 | $14.02 | 1.3 | $10.78 | $3.24 | $5,338 |
| COCOA POWDER | 6,900 | $4.89 | 1.3 | $3.76 | $1.13 | $7,786 |
| CREAM FLAVOR | 700 | $7.09 | 1.3 | $5.45 | $1.64 | $1,145 |
| FRENCH VANILLA FLAVOR | 3,900 | $13.96 | 1.3 | $10.74 | $3.22 | $12,564 |
| SALT | 250 | $3.41 | 1.3 | $2.62 | $0.79 | $197 |
| STEVIA | 1,280 | $52.70 | 1.3 | $40.54 | $12.16 | $15,567 |
| XANTHAN GUM | 850 | $10.99 | 1.3 | $8.45 | $2.54 | $2,156 |
| **Total for Sample** | | | | | | **$45,784** |
| | | | | | | |
| Invoices Sampled | | | | | | $480,535 |
| Total Invoices | | | | | | $529,782 |
| **Ratio** | | | | | | **90.7%** |
| | | | | | | |
| Lost Profit Per Sample | | | | | | $45,784 |
| Divided by: Invoice % Sampled | | | | | | 90.7% |
| **Total Lost Profit** | | | | | | **$50,476** |

Exhibit 3
- 24 -

Confidential Attorney Work Product

4 and 1 Nutrition, LLC v. Sun Brothers, LLC

Attachment 5

**Sun Brothers, LLC**
**4 and 1 Sales Invoice Testing**
**Purchases Summary Schedule**

| Date | 4 and 1 Invoice # | Item # | Units (KG) |
|---|---|---|---|
| 02/18/10 | 12 | Oryzatein | 11,050 |
| 04/07/10 | 15 | Oryzatein | 11,775 |
| 06/28/10 | 27 | Oryzatein | 2,000 |
| 07/05/10 | 28 | Oryzatein | 3,000 |
| 07/06/10 | 30 | Oryzatein | 1,000 |
| 07/20/10 | 31 | Oryzatein | 3,000 |
| 07/22/10 | 32 | Oryzatein | 18,700 |
| 08/18/10 | 36A | Oryzatein | 9,350 |
| 08/12/10 | 38B | Oryzatein | 9,350 |
| 10/26/10 | 42A | Oryzatein | 9,350 |
| 10/26/10 | 42B | Oryzatein | 9,350 |
| 01/12/11 | 45 | Oryzatein | 18,700 |
| 01/12/11 | 46 | Oryzatein | 9,350 |
| 02/28/11 | 48A | Oryzatein | 18,700 |
| 02/28/11 | 48B | Oryzatein | 18,700 |
| 04/01/11 | 50 | Oryzatein | 18,700 |
| 05/19/11 | 56A | Oryzatein | 18,650 |
| 05/19/11 | 56B | Oryzatein | 18,700 |
| 05/02/11 | 58 | Oryzatein | 4,250 |
| 07/20/11 | 61 | Oryzatein | 15,300 |
| 08/04/11 | 62 | Oryzatein | 18,700 |
| 11/01/11 | 66 | Oryzatein | 18,700 |
| 11/11/11 | 69 | Oryzatein | 18,700 |
| **Total** | | | **285,075** |

**Exhibit 3**
**- 25 -**

Confidential Attorney Work Product

4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 6

**Sun Brothers, LLC**
**Sales History Report 2010-2011**
**Recalculated COGS**

| Product | 2010 Finished Good Units (A) | 2011 Finished Good Units (A) | Total Finished Good Units (C) | 2010 Sales (A) | 2011 Sales (A) | Total Sales (C) | Rice Protein KG Per Unit (B) | Recalculated COGS KG (C) |
|---|---|---|---|---|---|---|---|---|
| Protein Raw Vegan-Natural | 16,590 | 32,167 | 48,757 | $421,346 | $838,255 | $1,259,601 | 0.9950 | 48,513 |
| Protein Raw Vegan-Vanilla | 37,348 | 60,304 | 97,652 | $971,544 | $1,598,805 | $2,570,349 | 0.9000 | 87,887 |
| Protein Raw Vegan-Chocolate | 20,771 | 36,650 | 57,421 | $545,342 | $995,367 | $1,540,709 | 0.8318 | 47,763 |
| Activated Barley 1lbs | 2,735 | 3,795 | 6,530 | $43,390 | $61,960 | $105,349 | 0.0000 | 0 |
| Activated Barley 900 grams | 3,174 | 4,957 | 8,131 | $90,525 | $138,573 | $229,098 | 0.0000 | 0 |
| Ormus Greens | 13,174 | 22,599 | 35,773 | $376,571 | $609,120 | $985,691 | 0.0000 | 0 |
| Immune Shield | 776 | 1,906 | 2,682 | $11,429 | $29,886 | $41,315 | 0.0000 | 0 |
| Liquid Light | 2,395 | 8,254 | 10,649 | $41,867 | $142,082 | $183,950 | 0.0000 | 0 |
| Australia Protein-Chocolate | 864 | 7,046 | 7,910 | $17,280 | $142,396 | $159,676 | 0.8318 | 6,580 |
| Australia Protein-Vanilla | 864 | 8,068 | 8,932 | $17,280 | $163,268 | $180,548 | 0.8990 | 8,030 |
| Australia Protein-Natural | 1,728 | 4,264 | 5,992 | $34,560 | $86,634 | $121,194 | 0.9950 | 5,962 |
| Australia Activated Barley 900gm | 0 | 400 | 400 | $0 | $8,400 | $8,400 | 0.0000 | 0 |
| Australia Ormus Greens | 0 | 705 | 705 | $0 | $14,805 | $14,805 | 0.0000 | 0 |
| Chocolate Protein 500g | 227 | 1,491 | 1,718 | $2,970 | $19,112 | $22,082 | 0.4159 | 715 |
| Natural Protein 500g | 97 | 1,825 | 1,922 | $1,306 | $23,832 | $25,138 | 0.4975 | 956 |
| Vanilla Protein 500g | 1,538 | 2,328 | 3,866 | $9,394 | $31,839 | $41,233 | 0.4495 | 1,738 |
| Protein Bottle - Natural | 0 | 468 | 468 | $0 | $11,414 | $11,414 | 0.9950 | 466 |
| Protein Bottle - Vanilla | 0 | 1,770 | 1,770 | $0 | $43,339 | $43,339 | 0.9000 | 1,593 |
| Protein Bottle - Chocolate | 0 | 928 | 928 | $0 | $22,695 | $22,695 | 0.8318 | 772 |
| Canada Protein-Chocolate | 0 | 4,298 | 4,298 | $0 | $85,960 | $85,960 | 0.8318 | 3,575 |
| Canada Protein-Natural | 0 | 3,402 | 3,402 | $0 | $68,040 | $68,040 | 0.9950 | 3,385 |
| Canada Protein-Vanilla | 0 | 8,513 | 8,513 | $0 | $170,260 | $170,260 | 0.9000 | 7,662 |
| Canada Ormus Greens | 0 | 720 | 720 | $0 | $18,755 | $18,755 | 0.0000 | 0 |
| Detox Bundle | 0 | 50 | 50 | $0 | $3,450 | $3,450 | 0.0000 | 0 |
| Warrior Blend Natural 1kg | 0 | 2,626 | 2,626 | $0 | $65,928 | $65,928 | 0.0000 | 0 |
| Warrior Blend Vanilla 1kg | 0 | 8,137 | 8,137 | $0 | $217,446 | $217,446 | 0.0000 | 0 |
| Warrior Blend Chocolate 1kg | 0 | 6,230 | 6,230 | $0 | $160,665 | $160,665 | 0.0000 | 0 |
| Warrior Blend Chocolate 500g | 0 | 1,653 | 1,653 | $0 | $26,091 | $26,091 | 0.0000 | 0 |
| Warrior Blend Natural 500g | 0 | 1,183 | 1,183 | $0 | $18,022 | $18,022 | 0.0000 | 0 |
| Warrior Blend Vanilla 500g | 0 | 2,330 | 2,330 | $0 | $38,948 | $38,948 | 0.0000 | 0 |
| **Total** | **102,281** | **239,067** | **341,348** | **$2,584,804** | **$5,855,347** | **$8,440,151** | | **225,595** |

(A) Information provided by Sun
(B) Information provided by Sun and 4 and 1
(C) Calculated

**Exhibit 3**
**- 26 -**

Confidential Attorney Work Product

4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 7

**Sun Brothers, LLC**
**2008 YTD Sales History**

| Products | Sales per Sun (A) | Avg 2008 Unit Sales Price Per Sun | Units Calculated | Rice Protein KG Per Unit Per Sun | Rice Protein KG for Units Sold |
|---|---|---|---|---|---|
| Protein Raw Vegan Vanilla | $316,549 | $32.36 | 9,782 | 0.9000 | 8,804 |
| Protein Raw Vegan Chocolate | $157,764 | $32.40 | 4,869 | 0.8318 | 4,050 |
| Activated Barley 900 gm. Container | $28,081 | $16.38 | 1,714 | 0.0000 | 0 |
| Activated Barley 1 lb. Container | $8,169 | $29.18 | 280 | 0.0000 | 0 |
| **Total** | **$510,563** | | | | **12,854** |
| Waste Factor Per Sun | | | | | 10.0% |
| **Waste (KG)** | | | | | **1,285** |
| | | | | | |
| **Rice Protein KG Purchased Per 4 and 1 Invoices (KG)** | | | | | **56,225** |
| | | | | | |
| **Rice Protein Beginning Inventory 1/1/08 (KG)** | | | | | **0** |
| Add: Purchases (KG) | | | | | 56,225 |
| Less: COGS | | | | | (12,854) |
| Less: Spoilage/Waste | | | | | (1,285) |
| **Ending Inventory 12/31/08 (Calculated) (KG)** | | | | | **42,085** |

(A) Total sales agrees with QuickBooks accounting file and 2008 Federal Income Tax Return

**Exhibit 3**
**- 27 -**

Confidential Attorney Work Product

4 and 1 Nutrition, LLC v. Sun Brothers, LLC
Attachment 7

**Sun Brothers, LLC**
**2009 YTD Sales History**

| Product Name | Units Per Sun | Sales Per Sun (A) | Avg 2009 Unit Sales Price Per Sun | Sales Per QB & Tax Return (A) | Adjusted Units Calculated (A) | Rice Protein KG Per Unit Per Sun | Rice Protein KG for Units Sold |
|---|---|---|---|---|---|---|---|
| Protein Raw Vegan-Vanilla | 16,417 | $439,589 | $26.78 | $575,428 | 21,490 | 0.9000 | 19,341 |
| Protein Raw Vegan-Chocolate | 11,285 | $302,227 | $26.78 | $395,620 | 14,772 | 0.8318 | 12,288 |
| Activated Barley 1lbs | 1,712 | $28,049 | $16.38 | $36,716 | 2,241 | 0.0000 | 0 |
| Activated Barley 900 grams | 2,390 | $69,751 | $29.18 | $91,305 | 3,129 | 0.0000 | 0 |
| Ormus Greens | 303 | $7,400 | $24.42 | $9,687 | 397 | 0.0000 | 0 |
| **Total** | **32,107** | **$847,016** | **$26.38** | **$1,108,756** | **42,029** | | **31,629** |
| Waste Factor Per SW | | | | | | | 10.0% |
| **Waste (KG)** | | | | | | | **3,163** |
| | | | | | | | |
| **Rice Protein Purchased per QuickBooks** | | | | | | | **$130,260** |
| Average Price Per KG per 4 and 1 | | | | | | | $5.95 |
| **Rice Protein KG Purchased** | | | | | | | **21,892** |
| | | | | | | | |
| **Spoilage Per QuickBooks** | | | | | | | **$94,723** |
| Average Price Per KG per 4 and 1 | | | | | | | $5.95 |
| **Rice Protein KG Spoilage** | | | | | | | **15,920** |
| | | | | | | | |
| Rice Protein Beginning Inventory 1/1/09 (KG) | | | | | | | 42,085 |
| Add: Purchases | | | | | | | 21,892 |
| Less: COGS | | | | | | | (31,629) |
| Less: Spoilage/Waste | | | | | | | (19,083) |
| **Ending Inventory 12/31/09 (Calculated) (KG)** | | | | | | | **13,267** |

(A) There was a discrepancy in sales per the 2009 Sales History Report at $847,016 and the 2009 Federal Income Tax Return and the QuickBooks accounting file. Both of these sources have the 2009 sales at $1,108,756. Wes Williams, Sun CFO was not able to reconcile the difference, but believes the $1,108,756 is correct. Since the product detail was not available to support the quatities sold for the $1,108,756 in sales, these units were calculated based on the sales detail for the $847,016.

Confidential Attorney Work Product

**Exhibit 3**
**- 28 -**

# EXHIBIT 4



resolution economics LLC
9777 Wilshire Blvd. Suite 600
Beverly Hills, CA 90212

**Bob Bransky**
**4 and 1 Nutrition LLC**
12100 Wilshire Blvd. Suite 800
Los Angeles, CA  90025

| | |
|---|---|
| Invoice Number: | **077162** |
| Invoice Date: | **02/29/12** |
| Billing Period: | **01/01/12 - 01/31/12** |
| Terms: | **Due On Receipt** |

Re:     **LAP005455    4 and 1 Nutrition LLC Compliance Audit**

# INVOICE

| Item | Description | Amount |
|---|---|---|
| Partner | | $600.00 |
| Director | | $6,680.00 |
| Research Assistant | | $130.00 |
| Financial Analyst | | $1,347.50 |
| Other Expenses | | $1,084.60 |
| | **Amount Due:** | **$9,842.10** |

*This invoice is for professional services rendered for the matter listed above. Detailed fee and expense information is attached. If you have any questions, please feel free to contact our Office Administrator at 310-275-9137.*

**resolution economics** LLC
9777 Wilshire Blvd. Suite 600
Beverly Hills, CA 90212

**Bob Bransky**
**4 and 1 Nutrition LLC**
12100 Wilshire Blvd. Suite 800
Los Angeles, CA  90025

| | |
|---|---|
| Invoice Number: | **077162** |
| Invoice Date: | **02/29/12** |
| Billing Period: | **01/01/12 - 01/31/12** |
| Terms: | **Due On Receipt** |

Re:    **LAP005455    4 and 1 Nutrition LLC Compliance Audit**

# INVOICE DETAILS

| Date | Staff Member | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 01/23/12 | Alex Kummer | Discuss case background with MJS; review documents | 1.40 | $175.00 | $245.00 |
| 01/24/12 | Alex Kummer | Inventory purchased and summary invoice PBC reference | 2.10 | $175.00 | $367.50 |
| 01/25/12 | Alex Kummer | Review and discuss PBC list with MJS | 0.60 | $175.00 | $105.00 |
| 01/27/12 | Alex Kummer | Purchase, update, and activate AIS on QB | 0.60 | $175.00 | $105.00 |
| 01/30/12 | Alex Kummer | Initial review and assessment of inventory detail in QB file; | 1.00 | $175.00 | $175.00 |
| 01/30/12 | Alex Kummer | Reviewed purchase order and sales detail; Reviewed cash detail | 1.30 | $175.00 | $227.50 |
| 01/31/12 | Alex Kummer | Meeting with team | 0.70 | $175.00 | $122.50 |
| | **ALEX KUMMER TOTAL:** | | **7.70** | | **$1,347.50** |
| 01/18/12 | Michael Shurgot | Discuss case background; call with attorney and client | 0.50 | $400.00 | $200.00 |
| 01/18/12 | Michael Shurgot | Consider scope and audit procedures to be applied; create test samples | 2.50 | $400.00 | $1,000.00 |
| 01/19/12 | Michael Shurgot | Call with attorney; create and edit PBC list of documents to be prepared by Sun Brothers for audit | 2.80 | $400.00 | $1,120.00 |
| 01/20/12 | Michael Shurgot | Update PBC list; call with Cody at Sun Brothers; review product formula and ingredients for subject audit | 1.80 | $400.00 | $720.00 |
| 01/23/12 | Michael Shurgot | Update PBC list; review Dec 2009 licensing agreement and amendment; create project notes; call with Cody and Wes @ SW Re: timing and PBC list; call with attorneys | 2.80 | $400.00 | $1,120.00 |
| 01/24/12 | Michael Shurgot | Review supplier invoices to Sunwarrior and summary; create purchases detail | 0.50 | $400.00 | $200.00 |
| 01/25/12 | Michael Shurgot | Call with Wes Williams, CFO of Sun Brothers to discuss scope and PBC list | 0.30 | $400.00 | $120.00 |
| 01/26/12 | Michael Shurgot | Download 650MB file from FTP site; add advanced inventory to open file; initial review of inventory | 1.00 | $400.00 | $400.00 |
| 01/30/12 | Michael Shurgot | Review inventory and cash detail; built data tables and pivot tables to summarize data for audit; review of sales detail; review purchase order detail; review of inventory adjustments; extracted Natural Ops billing detail and sent invoice request list to Wes. | 4.50 | $400.00 | $1,800.00 |
| | **MICHAEL SHURGOT TOTAL:** | | **16.70** | | **$6,680.00** |
| 01/18/12 | Robert Crandall | Review work in progress | 0.50 | $600.00 | $300.00 |
| 01/30/12 | Robert Crandall | Review work in progress | 0.50 | $600.00 | $300.00 |
| | **ROBERT CRANDALL TOTAL:** | | **1.00** | | **$600.00** |
| 01/31/12 | Tigran Yeremyan | Reviewed Natural OPS Invoices; Complete invoice List from invoices | 2.00 | $65.00 | $130.00 |
| | **TIGRAN YEREMYAN TOTAL:** | | **2.00** | | **$130.00** |
| **TOTAL PROFESSIONAL FEES:** | | | **27.40** | | **$8,757.50** |

**Exhibit 4**
**- 30 -**



resolution economics LLC
9777 Wilshire Blvd, Suite 600
Beverly Hills. CA 90212

**Bob Bransky**
**4 and 1 Nutrition LLC**
12100 Wilshire Blvd. Suite 800
Los Angeles, CA  90025

| | |
|---|---|
| Invoice Number: | **077162** |
| Invoice Date: | **02/29/12** |
| Billing Period: | **01/01/12 - 01/31/12** |
| Terms: | **Due On Receipt** |

Re:      **LAP005455    4 and 1 Nutrition LLC Compliance Audit**

# INVOICE DETAILS

| Date | Source | Description | Units | Rate | Amount |
|---|---|---|---|---|---|
| 01/27/12 | Alex Kummer | Advanced Inventory Subscription | | | $699.00 |
| | **ALEX KUMMER TOTAL:** | | | | **$699.00** |
| 01/19/12 | Expedia | Airfare: Shurgot; LAX-LAS | | | $385.60 |
| | **EXPEDIA TOTAL:** | | | | **$385.60** |
| **TOTAL REIMBURSABLE EXPENSES:** | | | | | **$1,084.60** |

# EXHIBIT 5

**resolution economics** LLC
9777 Wilshire Blvd, Suite 600
Beverly Hills, CA 90212

**Bob Bransky**
**4 and 1 Nutrition LLC**
12100 Wilshire Blvd. Suite 800
Los Angeles, CA  90025

| | |
|---|---|
| Invoice Number: | **077255** |
| Invoice Date: | **04/04/12** |
| Billing Period: | **02/01/12 - 03/30/12** |
| Terms: | **Due On Receipt** |

Re:   **LAP005455   4 and 1 Nutrition LLC Compliance Audit**

# INVOICE

| Item | Description | Amount |
|---|---|---|
| Partner | | $2,880.00 |
| Director | | $28,520.00 |
| Analyst | | $5,412.00 |
| Financial Analyst | | $1,300.00 |
| Other Expenses | | $1,098.81 |
| Apply Retainer | | -$5,000.00 |
| | **Amount Due:** | **$34,210.81** |

*This invoice is for professional services rendered for the matter listed above. Detailed fee and expense information is attached. If you have any questions, please feel free to contact our Office Administrator at 310-275-9137.*

**Total Outstanding Balance:**

| | > 90 Days | 61-90 Days | 31-60 Days | 1-30 Days | Current | Balance Due |
|---|---|---|---|---|---|---|
| | $0.00 | $0.00 | $0.10 | $0.00 | $34,210.81 | $34,210.91 |

**resolution economics** LLC
9777 Wilshire Blvd. Suite 600
Beverly Hills, CA 90212

**Bob Bransky**
**4 and 1 Nutrition LLC**
12100 Wilshire Blvd. Suite 800
Los Angeles, CA  90025

| | |
|---|---|
| Invoice Number: | **077255** |
| Invoice Date: | **04/04/12** |
| Billing Period: | **02/01/12 - 03/30/12** |
| Terms: | **Due On Receipt** |

Re:   **LAP005455   4 and 1 Nutrition LLC Compliance Audit**

# INVOICE DETAILS

| Date | Staff Member | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 02/02/12 | Alex Kummer | Analyze cash paid to vendor detail, build summary | 2.40 | $200.00 | $480.00 |
| 02/03/12 | Alex Kummer | Assist in question preparation for client; discuss with MJS | 0.80 | $200.00 | $160.00 |
| 02/03/12 | Alex Kummer | Analyze cash paid to Vendor, update schedule | 0.40 | $200.00 | $80.00 |
| 02/10/12 | Alex Kummer | Supervise and assit AM with sales in PT | 0.40 | $200.00 | $80.00 |
| 02/23/12 | Alex Kummer | Meet with team, discuss rollforward with MJS | 0.70 | $200.00 | $140.00 |
| 03/07/12 | Alex Kummer | Review report; discuss with MJS | 1.20 | $200.00 | $240.00 |
| 03/19/12 | Alex Kummer | Discuss and review analysis with AM | 0.20 | $200.00 | $40.00 |
| 03/23/12 | Alex Kummer | Review report | 0.40 | $200.00 | $80.00 |
| | **ALEX KUMMER TOTAL:** | | **6.50** | | **$1,300.00** |
| 02/09/12 | Anna Miller | Review sales reports for 2010 and 2011; create sales data; analysis of sale transactions | 6.00 | $110.00 | $660.00 |
| 02/10/12 | Anna Miller | COGS model for 2010-2011; other ingredients modeling; review details of licensing agreement | 7.00 | $110.00 | $770.00 |
| 02/13/12 | Anna Miller | Calculate 2008-09 COGS; vendor invoice review and analysis; generate questions for SW mgmt; prep for report | 5.50 | $110.00 | $605.00 |
| 02/14/12 | Anna Miller | Bank cash transfer review and analysis | 5.00 | $110.00 | $550.00 |
| 02/17/12 | Anna Miller | Analyze and review shipping documents; estimate coverage; search for other rice protein vendors | 4.60 | $110.00 | $506.00 |
| 02/22/12 | Anna Miller | Conference call with client | 0.60 | $110.00 | $66.00 |
| 02/23/12 | Anna Miller | Review report; review cash details for rice protein purchases in 2008 and 2009 | 1.00 | $110.00 | $110.00 |
| 02/24/12 | Anna Miller | Review calculations; Examine cash detail for partner transactions and calculate totals | 5.50 | $110.00 | $605.00 |
| 03/05/12 | Anna Miller | 2008 4 and 1 invoice review and reconciliation | 3.00 | $110.00 | $330.00 |
| 03/12/12 | Anna Miller | Review report | 0.50 | $110.00 | $55.00 |
| 03/19/12 | Anna Miller | Alter ego review and analysis | 7.50 | $110.00 | $825.00 |
| 03/20/12 | Anna Miller | Alter ego review and analysis | 3.00 | $110.00 | $330.00 |
| | **ANNA MILLER TOTAL:** | | **49.20** | | **$5,412.00** |
| 02/01/12 | Michael Shurgot | Review bill of materials; review sales detail; build pivot tables and create reports; develop question list for SW; review build out of Natural Ops detail | 6.50 | $400.00 | $2,600.00 |
| 02/03/12 | Michael Shurgot | Review bank statements; develop invoice report for sampling | 1.50 | $400.00 | $600.00 |
| 02/06/12 | Michael Shurgot | Audit field work; review schedules, interviews with mgmt; info requests; discussion of alternative test procedures | 6.50 | $400.00 | $2,600.00 |
| 02/07/12 | Michael Shurgot | Audit field work; review schedules, interviews with mgmt; info requests; discussion of alternative test procedures | 6.00 | $400.00 | $2,400.00 |

Thursday, April 05, 2012

**Exhibit 5**
**- 33 -**

Invoice, Page 2

**resolution economics** LLC
9777 Wilshire Blvd. Suite 600
Beverly Hills, CA 90212

**Bob Bransky**
**4 and 1 Nutrition LLC**
12100 Wilshire Blvd. Suite 800
Los Angeles, CA  90025

| | |
|---|---|
| Invoice Number: | **077255** |
| Invoice Date: | **04/04/12** |
| Billing Period: | **02/01/12 - 03/30/12** |
| Terms: | **Due On Receipt** |

Re:   **LAP005455   4 and 1 Nutrition LLC Compliance Audit**

# INVOICE DETAILS

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 02/09/12 | Michael Shurgot | Review sales data for 2010-11; create COGS model for forecast; generate vendor invoice list for sampling; sent list of other open items to SW | 5.00 | $400.00 | $2,000.00 |
| 02/10/12 | Michael Shurgot | Update inventory rollforward model; created rice protein and other ingredients lost profit models; created COGS model based on SW 2010-11 sales schedules | 6.00 | $400.00 | $2,400.00 |
| 02/13/12 | Michael Shurgot | 2008-09 inventory rollforward; Reviewed cash transfer detail | 2.50 | $400.00 | $1,000.00 |
| 02/14/12 | Michael Shurgot | Inventory rollforward models; reviewed cash transfer work and developed questions for mgmt | 4.50 | $400.00 | $1,800.00 |
| 02/16/12 | Michael Shurgot | Update models with waste factors for 2008-2011 provided by SW; review of shipping documents; communicate progress to attorneys | 3.30 | $400.00 | $1,320.00 |
| 02/17/12 | Michael Shurgot | Rollforward of pea protein inventory to determine accuracy of ending balance; review cash transactions | 2.00 | $400.00 | $800.00 |
| 02/21/12 | Michael Shurgot | Call with attorney with status; setup meeting with client; develop report findings | 2.50 | $400.00 | $1,000.00 |
| 02/23/12 | Michael Shurgot | Analyze 2008-09 cash detail; update inventory rollforward model; call with attorney | 1.50 | $400.00 | $600.00 |
| 03/04/12 | Michael Shurgot | Review case file and start formatting and building report, including attachments. | 6.00 | $400.00 | $2,400.00 |
| 03/05/12 | Michael Shurgot | Continued working on report; reviewed 2008 4 and 1 invoices and lead schedules | 6.50 | $400.00 | $2,600.00 |
| 03/07/12 | Michael Shurgot | Continued developing report and attachments | 2.50 | $400.00 | $1,000.00 |
| 03/09/12 | Michael Shurgot | Developing report and attachments; checking internal references | 4.00 | $400.00 | $1,600.00 |
| 03/23/12 | Michael Shurgot | Finalize report and review | 4.50 | $400.00 | $1,800.00 |
| | **MICHAEL SHURGOT TOTAL:** | | **71.30** | | **$28,520.00** |
| 02/16/12 | Robert Crandall | Review work in progress | 1.00 | $600.00 | $600.00 |
| 03/07/12 | Robert Crandall | Review report | 1.80 | $600.00 | $1,080.00 |
| 03/20/12 | Robert Crandall | Review report | 0.60 | $600.00 | $360.00 |
| 03/22/12 | Robert Crandall | Review report | 1.40 | $600.00 | $840.00 |
| | **ROBERT CRANDALL TOTAL:** | | **4.80** | | **$2,880.00** |
| **TOTAL PROFESSIONAL FEES:** | | | **131.80** | | **$38,112.00** |

**Exhibit 5**
**- 34 -**

**resolution economics** LLC
9777 Wilshire Blvd, Suite 600
Beverly Hills, CA 90212

**Bob Bransky**
**4 and 1 Nutrition LLC**
12100 Wilshire Blvd. Suite 800
Los Angeles, CA  90025

| | |
|---|---:|
| Invoice Number: | **077255** |
| Invoice Date: | **04/04/12** |
| Billing Period: | **02/01/12 - 03/30/12** |
| Terms: | **Due On Receipt** |

Re:    **LAP005455    4 and 1 Nutrition LLC Compliance Audit**

# INVOICE DETAILS

| Date | Source | Description | Units | Rate | Amount |
|------|--------|-------------|-------|------|-------:|
| 02/01/12 | Egencia | Hotel: 2/6-2/9 | | | $600.00 |
| | **EGENCIA TOTAL:** | | | | **$600.00** |
| 02/06/12 | Michael Shurgot | Per diem allowance | | | $50.00 |
| 02/06/12 | Michael Shurgot | Airfare fees | | | $44.00 |
| 02/06/12 | Michael Shurgot | Transport to LAX | | | $40.00 |
| 02/07/12 | Michael Shurgot | Per diem allowance | | | $50.00 |
| 02/08/12 | Michael Shurgot | Transport from LAX | | | $40.00 |
| 02/08/12 | Michael Shurgot | Airfare fees | | | $44.00 |
| 02/08/12 | Michael Shurgot | Charge:Rental Car | | | $180.81 |
| 02/10/12 | Michael Shurgot | Per diem allowance | | | $50.00 |
| | **MICHAEL SHURGOT TOTAL:** | | | | **$498.81** |
| **TOTAL REIMBURSABLE EXPENSES:** | | | | | **$1,098.81** |

**Exhibit 5**
**- 35 -**